BROWN GAVALAS & FROMM LLP
Attorneys for Plaintiff
ENERGY SHIPPING S.p.A.
355 Lexington Avenue
New York, New York 10017
212-983-8500



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

ENERGY SHIPPING S.p.A.,

                   Plaintiff,

       -against-

QANNAS SHIPPING CO. and EMIRATES
TRADING AGENCY LLC,

                 Defendants.
----------------------------------------------------------X

07 Civ. 1837 (VM)

**AMENDED**
**VERIFIED COMPLAINT**

     Plaintiff, ENERGY SHIPPING S.p.A. ("Plaintiff"), by its attorneys Brown Gavalas &

Fromm LLP, as and for its Amended Verified Complaint against Defendants, QANNAS SHIPPING

CO. ("Qannas) and EMIRATES TRADING AGENCY LLC ("Emirates," and hereinafter with

Qannas, the "Defendants"), alleges upon information and belief as follows:

     1.     This is a case of admiralty and maritime jurisdiction, as hereinafter more fully

appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules

of Civil Procedure. The Court has jurisdiction under 28 United States Code Section 1333.

     2.     At all material times, Plaintiff was and now is a foreign corporation with an office

and place of business in Genoa, Italy.

     3.     Upon information and belief, at all material times, Defendant Qannas was and still is

a foreign corporation with a principal place of business at 1 Costaki Pantelides Avenue, Nicosia,

Cyprus, and was the registered and/or beneficial owner of the motor vessel CAPE COURAGE ("the

Vessel").

4.      Upon information and belief, at all material times, Defendant Emirates was and still is a foreign corporation with a principal place of business in Dubai, United Arab Emirates, and was the registered and/or beneficial owner of the Vessel.

5.      On or about August 9, 2006, a charter party agreement was entered into by and between Plaintiff and Qannas, whereby Plaintiff agreed to let, and Qannas, as charterer, agreed to hire the Vessel for one time charter trip, with an estimated duration of about fifty (50) days, and pursuant to other terms and conditions more fully set out in the agreement (hereinafter "Charter Agreement").

6.      Pursuant to said Charter Agreement, Defendants made various warranties and representations with regard to the Vessel's speed and rate of fuel consumption over the duration of the Charter Agreement.

7.      In fact, the Vessel and Defendants were not able to perform and satisfy the aforementioned warranties and representations regarding speed and fuel consumption, as required by the terms of the Charter Agreement.

8.      As a consequence of Defendants breach of the warranties of the Charter Agreement related to speed and fuel consumption, Plaintiff has incurred damages in the form of excess hire payments and fuel costs totaling $181,821.62.

9.      Clause 78 of said Charter Agreement directs that hire be paid to "Owners' Bank," which is described as for the account "Emirates Trading Agency LLC." A copy of the Charter Party is attached hereto as Exhibit "A."

10.     In other communications between the parties, Defendant Emirates has described itself as the "Owners" of the Vessel.

2

11.     Upon information and belief, there exists, and at all times herein mentioned there existed, a unity of interest and ownership between Defendants Qannas and Emirates, such that any individuality and separateness between Defendants have ceased, and Defendants are the alter egos of the other Defendant. Upon information and belief, Defendants Qannas and Emirates completely controlled, dominated, managed, and operated each other, and/or disregarded their corporate form, and/or conducted business and operations of each other as if the same were their own.

12.     Adherence to the fiction of the separate existence of the Defendants as entities distinct from one another would permit an abuse of the corporate privilege and would sanction fraud and promote injustice given the conduct of said Defendants as alleged more particularly herein.

13.     Under the terms of the Charter Agreement, all disputes between the parties are to be decided by arbitration in London, pursuant to English law.

14.     This action is in aid of said London arbitration proceedings in accordance with 9 U.S.C. § 8. Plaintiff seeks to obtain adequate security to satisfy a potential London arbitration award in Plaintiff's favor. Arbitration proceedings have already been commenced in London.

15.     Plaintiff, if it is successful in the London arbitration, will likely also be awarded interest, costs and attorneys' fees, as is routine in London arbitration proceedings. As best as can now be estimated, Plaintiff expects to recover the following amounts in the London arbitration:

| a. | On the principal claim | $181,821.62 |
|----|------------------------|-------------|
| b. | 3 years of interest at 6% per annum, compounded annually | $ 34,730.84 |
| c. | Costs (arbitrators' fees, attorneys' fees etc.) | $ 50,000.00 |
|    | TOTAL | $266,552.46 |

16.     Upon information and belief, Defendants cannot be found within the District, within

3

the meaning of Supplemental Rule B of the Federal Rules Civil Procedure, but are believed to have or will have during the pendency of this action assets within this District, specifically including cash, funds, freight, hire, accounts and other property, in the hands of garnishees in the District including but not limited to Mashreq Bank, American Express Bank Ltd., ABN-AMRO Bank, BNP New York, HSBC Bank, Bank of America, Bank of New York, J.P. Morgan Chase, Citibank, Standard Chartered PLC and Wachovia Bank, which are believed to be due and owing to the Defendants.

WHEREFORE Plaintiff prays:

A. That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Amended Verified Complaint;

B. That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of the Court to issue Process of Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules and the United States Arbitration Act, 9 U.S.C §§ 1 and 8, attaching all cash, goods, chattels, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee, including Mashreq Bank, American Express Bank Ltd., ABN-AMRO Bank, BNP New York, HSBC Bank, Bank of America, Bank of New York, J.P. Morgan Chase, Citibank, Standard Chartered PLC and Wachovia, which are due and owing to the Defendants, in the amount of $266,552.46 to secure the Plaintiff's claim, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged;

C. That this action be stayed and this Court retain jurisdiction over this matter through the

4

entry of a final London arbitration award and any appeals thereof; and

D. That Plaintiff have such other, further and different relief as this Court may deem just and

proper.

Dated: New York, New York
April 5, 2007

                        BROWN GAVALAS & FROMM LLP
                        Attorneys for Plaintiff
                        ENERGY SHIPPING S.p.A.

By: 
          Peter Skoufalos (PS-0105)
          355 Lexington Avenue
          New York, New York 10017
          212-983-8500

5

## VERIFICATION

STATE OF NEW YORK      )
                       :  ss.:
COUNTY OF NEW YORK  )

PETER SKOUFALOS, being duly sworn, deposes and says:

1.      I am a member of the bar of this Honorable Court and of the firm of Brown Gavalas

& Fromm LLP, attorneys for Plaintiff.

2.      I have read the foregoing Complaint and I believe the contents thereof are true.

3.      The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff

is a foreign corporation, no officer or director of which is within this jurisdiction.

4.      The sources of my information and belief are documents provided to me and

statements made to me by representatives of the Plaintiff.

PETER SKOUFALOS

Sworn to before me this
5th day of April 2007

Notary Public

EVAN B. RUDNICKI
Notary Public of the State of New York
No. 02RU6142314
Qualified in Rockland County
Term Expires March 13, 20

6

# EXHIBIT A





COPY

## Time Charter

GOVERNMENT FORM
Approved by the New York Produce Exchange
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party**, made and concluded in *Dubhal, the 9th* ............ *day of August* ...... *19 2006*
2  Between *Messrs. QANNAS SHIPPING COMPANY of Nicosia, Cyprus, as* ...........................
3  Owners of the good *Panamanian flag* ............ *Steamship/Motorship* " *CAPE COURAGE* " *- see clause No. 74.-* ..... *of* ...........
4  *of* .......... ........ tons gross register, and ......... tons net register, having engines of ........... indicated horse power
5  and with hull, machinery and equipment in a thoroughly efficient state, and loaded .......... .........
6  ........... ......... of about .......... ........ cubic feet hole capacity, and about .......... ......... tons of 2240 lbs.
7  dead-weight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's dead-weight capacity,
8  allowing a minimum of fifty tons) on a draft of .......... ......... feet .......... inches on ......... Summer Freeboard, inclusive of permanent bunkers,
9  which are of the capacity of about .......... ......... tons of fuel, and capable of steaming, fully laden, under good weather
10  conditions about .......... ......... knots on a consumption of about .......... ......... tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,
11  now trading - *vessel's present E.T.C./D. August 15th 2006 all going well, without any guarantee, unforseen circumstances*
12  *excepted, weather permitting* and *Messrs. ENERGY SHIPPING S.p.A.* .......... Charterers of the City of *Genova, Italy - V.A.T. No. 01215590991*
13

**Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14  *about one time charter trip via safe port(s)/safe anchorage(s)/safe berth(s), always afloat, always within Institute Warranty* .......
15  *Limits - China and Italy/Spain with bulk clinker - duration about 50,00.- (fifty) days. Trading limits with lawful harmless, non
    dangerous/hazardous bulk cargoes. NAABSA clause to apply for South America only where vessel of similar size can lie
    customary safely aground. Charterers are allowed to break Institute Warranty Limits, case by case, after obtaining
    Owners'permission, by paying extra insurance for breaking Institute Warranty Limits as per nderwriters'invoice/voucher, but
    always not exceeding Lloyds of London, within below mentioned trading limits. See also clause No. 77.-*
16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17  the fulfilment of this Charter Party. Acceptance of delivery by the Charterers shall not constitute any waiver of Charterers' rights under
    the Charter Party.
18  Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot 1.- (one) safe port China, intention Xingang* .......
19  *without any guarantee, at any time, days, nights, Sundays and Holidays included* ..........................
20  in such dock as or such half or place (where she may easily lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), at
21  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 6. Vessel on her delivery to be
22  ready to receive *any permissible* cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the *ordinary cargo service, having
    water ballast, winches and*
23  donkey-boiler with sufficient steam power, or, if not equipped with donkey-boiler, then other power sufficient to run all the winches at one and the same
24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25  dise, within provisions as to products in proper containers, excluding as per clause No. 56.- ..........
26  *petrol is not to be employed in the carriage of Live Stock, but Charterers are to have full privilege of shipping a small amount on deck at their risk,*
27  all necessary fittings and other requirements to be for account of Charterers), on such lawful trades, between safe port and/or ports in Bristol Heads
28  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Carribean Sea, and/or Gulf of Mexico, within
29  Mexico, and/or South America, .......... and/or Europe
30  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
31  October 31st and May 15th, Hudson Bay, and all vessels ports, also excluding those out of season, White Sea, Black Sea and the Baltic,
32  *worldwide trade within Institute Warranty Limits as per clause No. 49.-* ..............................
33  .......... ......... .........

34  as the Charterers or their Agents shall direct, on the following conditions.
35  1    That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
36  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her clean and keep
37  the vessel in a thoroughly efficient state in hull *cargo space*, machinery and equipment for and during the service.
38
39  2.   That whilst *on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *customary/compulsory
    Pilotages and pilotages in Dardanelles, Bosphorous and Great Belt, Agencies, Commissions,*
40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew *or cargoes carried prior delivery* to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel
43  chatter to be for Charterers account. All other *cargo* fumigations to be for Charterers account after vessel has been on charter for a continuous period
44  of six months or more.
45  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting *boards and lashing equipment* boards already aboard vessel. Charterers to have the privilege of using shifting boards.

47 for demurrage, they working good any damage thereto

48    3. That the Charterers, at their part of delivery, and the Owners, at their port of re-delivery, shall take over and pay for all fuel remaining on

49 board the vessel at the current price at the respective ports, the vessel to be delivered with not less than ............ tons and not more than ............ tons. *See Clause 59.*

50 ............ .......... ... tons and to be re-delivered with not less than ............ ............ tons and not more than ............ ............ tons. *See Clause 59.*

51    4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *US$ 21,000,00.- (twenty-one thousand Dollars) per day*

52 *or pro-rate including overtime basis one time charter trip. See also clauses Nos. 64.- and 77.-* United States Currency per ton on vessels total deadweight carrying capacity, including bunkers and

53 stores, on ............ ...... ...... ... ...... Summer deadweight, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at

54 and after the same rate for any part of a *day* thereof, hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot 1.- (one) safe port Skaw/Passero range and*

56 *Aden/Japan range in Charterers'option* unless otherwise mutually agreed. Charterers are to give Owners not-less-than *minimum advance 30.-*

57 *(thirty) days* notice of vessels expected date of re-delivery *range* and 15/12 *days notice of definite redelivery* and probable *and 10/7/5/3/2/1 day(s) notice of vessel's redelivery date.*

58    5. Payment of said hire *less commission* to be made as per *clause No. 78.-* in New-York in cash in United States Currency, semi-monthly *every 15 days* in advance, and for the last *15 days* half month or

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61 hire, or bank guarantee, or on any *fundamental* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count as *from vessel's delivery* from 7 a.m. on the working-day

63 following that on which notice notice of readiness has been given to Charterers or their Agents before 4 p.m. but if required by Charterers they to-have the privilege of using vessel at once, each time used to count as hire

65    Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, *after obtaining Owners' consent*, subject

66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67 of such advances.

68    6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf *or safe anchorage* and or *safe place including double banking* that Charterers or their Agents may

67 direct, provided the vessel can safely lie always afloat at any time of tide, except at *South America* such places where it is customary for similar size vessels to safely

70 lie aground. *See clause No. 80.-*

71    7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers to be at accommodation allow. Charterers paying Owners ... ...... ............ per day per passenger for accommodation and meals. However, it is agreed that in case on fines in extra expenses are incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.

76    8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and direction of the Charterers as regards employment and

78 agency; and Charterers are to load, stow, and trim, *lash, dunnage, secure, unlash, separate, tally and discharge* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading or *is to authorize Charterers' agents to sign* for

79 cargo as presented, in conformity with Mate's *signed receipt without prejudice to this Charter Party*. or Tally-Clerk's receipts.

80    9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82    10. That the Charterer shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84 rate of $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers paying *US$ 1,250.00.- (one thousand two hundred and fifty Dollars) lumpsum* at the current rate per-meal-for all such victualling *per month/pro-rata including cable/telexes/victualling and representation which to be paid directly to Owners'bankers*.

86    11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-

89 sumption of fuel.

90    12. That the Captain shall use diligence in caring for the ventilation of the cargo.

91    13. That the Charterers shall have the option of continuing this charter for a further period of ... ... ... .. ...... ...... ...... ...... ...... ...... ......

92 ...... ...... ...... ...... ...... ...... ...... ...... ...... ...... ...... ...... ...... ...... ...... ...... ...... ...... ...... ......

93 on giving written notice thereof to the Owners or their Agents ... ... ...... ...... days previous to the expiration of the first-named term, or any declared option.

94    14. That if required by Charterers, time not to commence before *the 17th August 2006.* ... ...... ...... ............ ............ and should vessel

95 not have given written notice of readiness on or before *the 24th August 2006* ...... ...... ...... ...... ...... ...... but not later than 4 p.m. Charterers or

96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *See also clause No. 64.-*

97    15. That in the event of the loss of time *including loss of time or deviation due to deficiency and/or sickness, accident or default of man or* from deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment,

98 grounding, detention by average accidents to ship or cargo, dry-docking for the purpose of examination or painting bottom, or by any other cause

99 preventing the full use of *vessel to Charterers* working of the vessel, the payment of hire shall cease for the time thereby lost *until the vessel has resumed the voyage as same or equidistant position*, and if upon the voyage the speed be reduced by

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101 thereof, and all extra expenses shall be deducted from the hire *and all extra expenses incurred directly related to the vessel including bunker consumed during period of suspended hire, can be deducted*

102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.

107 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* New York,
108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping men*. *English Law to*
110 *apply. See also clause No. 73.*

110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights and *sub-hire* for any amounts due under this Charter, including General
Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.

114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116 York-Antwerp Rules 1924. *See also clause No. 81.* ~as each part or place in the United States as may be selected by the carrier, and in as much as~
provided for by these

117 ~Rules; according to the-laws and usages at the port of New York in such adjustment disbursements in foreign currencies shall be exchanged into~
118 ~United States money at the-rate prevailing on the dates made and such costs for damage to cargo claimed in foreign currency shall be converted at~
119 ~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~
120 ~bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~
121 ~or his agents may deem sufficient to additional security for the contribution of the goods and for any salvage and special charges thereon, shall if~
122 ~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~
123 ~carrier, be payable in United States money and be remitted to the carrier. When so remitted the deposit shall be held in a special account at the~
124 ~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~
125 ~United States money.~

126 ~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~
127 ~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the~
128 ~goods, the shippers and the consignees, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~
129 ~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~
130 ~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~
131 ~ships belonged to strangers.~

132 Provisions as to General Average in accordance with the above are to be inserted in all bills of lading issued hereunder.

133 20. *Fuel Bunkers* used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to at so quantity, and the
134 cost of replacing same, to be allowed by Owners.

135 21. That all the meetings for the shore vessels in time employed on a capital vessels during our terms of this Charter Vessel is to be access at a
136 convenient place, bottom cleaned and painted whenever Charterers and Captain shall accordingly, at least once in every six months, reckoning from
137 time of last painting, and payment of dis-hire to be suspended until she is again in proper state for the service.

138 *See clauses Nos. 57.- and 59.-*...

139 ...

140 22. ~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling life-up to three tons, also~
141 ~providing ropes, falls, slings and blocks. If vessel is fitted with derrick capable of handling heavier lifts, Owners are to provide winches, gear for~
142 same, otherwise equipment and gear for heavier lifts shall be for Charterers account.~ Owners also to provide on the vessel lantern *electric lights* and oil for
143 night work, and vessel to give use of electric light, when so fitted, ~but any additional light over those on board to be at Charterers' expense. The~
144 ~Charterers to have the use of any gear on board the vessel.~

145 23. Vessel to work night and day, if required by Charterers, and all ~winches for the use or Charterers' expense during loading and discharging,~
146 ~master to provide one watchman per hatch to work number-by and night, if required. Charterers agreeing to pay officers, engineers, winchmen,~
147 ~deck hands and donkeyman for overtime work done in accordance with the working hours and rates noted in the ships articles. If the amount of the~
148 port, or labor unions, permit-crew from driving winches, shore ~Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~
149 ~insufficient power to operate winches, Owners to pay for such engine, or repairs, or hire thereof, if required, and pay-any loss of time occasioned~
150 thereby. Ship's guard/watchmen for Owners' account. If shore watchmen compulsory, all expense incurred for same to be for Charterers' account*

151 24. *See clause No. 61.-* ~In so far mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability~
contained

152 ~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~
153 ~etc." in respect of all cargo shipped under this charter as to from the United States of America. It is further agreed as to the following, viz:~
154 ~of which are to be inserted in all bills of lading issued hereunder.~

155 U. S. A. Clause Paramount
156 ~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States approved April~
157 ~16, 1936, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of~
158 ~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~
159 ~be repugnant to said Act to any extent, such term shall be void to this extent, but no further.~

160 Both to Blame Collision Clause
161 ~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~
162 ~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~
163 ~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~
164 ~or liability represents loss of or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~
165 ~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~
166 ~owners as part of their claim against the carrying ship or carrier.~

167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. The vessel not to be obliged to force any form of ice, nor to follow
ice-breaker, if on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the
vessel being frozen in and/or dunnage, he has liberty to sail to a convenient open place and await the Charterers' fresh
instructions, detention and any time lost through any of the above causes to be for Charterers' account.

170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterer. The owners to remain responsible for the
171 navigation of the vessel, her seaworthiness act of pilots or tugboats insurance, crew, and all other matters, same as when trading for their own account.
172 27. A commission of 2-1/2 1.25 per cent is payable by the Vessel and Owners to Messrs GENOA SEA BROKERS SPA, Genova
173 ----------
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28. An address commission of 2 1/2 per cent payable to Charterers ........ ........ -- --- - on the hire earned and paid under this Charter.

Clauses from No. 29.- to No. 112.-, both inclusive, as enacted, are to be considered fully incorporated and to apply to this
Charter Party.

THE OWNERS                    THE CHARTERERS

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.) Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

## M/V "CAPE COURAGE"

### CLAUSE 29 - Wireless Station, Port Telephone

Charterers have the right to use vessel's wireless station at cost according to tariff. The Master to instruct the radio officer to listen to Charterers' nominate radio station(s), if in port a telephone is installed on board, the Master to enclose upon billing towards Charterers, receipt of telephone company with number / connections reached.

### CLAUSE 30 - Personal Accident

Owners shall keep Charterers harmless for personal accidents or injuries sustained by crew or stevedores on board. Owners undertake to have a safety net or gangway. Owners to maintain full entry into P and I Association in accordance with the standards of the International Group of P. and I. Clubs.

### CLAUSE 31 - Hire Payment

Notwithstanding the provisions of clause No. 5.- in the Charter Party is agreed that if any hire is not paid to Owners' account on the due date because of an oversight and/or delay in remittance, Owners to give Charterers 3.- (three) working days grace before being entitled to exercise their rights.

### CLAUSE 32 - Weather Routing

Charterers may supply independent weather routing advice for their account to the Master during voyages specified by the Charterers. The Master to comply with the reporting procedure of the routing service selected by Charterers. However, Master at his reasonable discretion may not follow suggested routes, in which case the reason to be detailed in log book. Evidence of weather conditions to be taken from the vessel's deck logs and independent weather bureau reports. In the event of a consistent discrepancy between the deck logs and independent bureau reports, then the independent bureau reports to be taken as ruling. For the purpose of this Charter Party 'good weather conditions' are defined as weather conditions in wind speeds not exceeding Beaufort Force 4.- (four) and sea not exceeding Beaufort Force 3.- (three).

It is also understood that speed / consumption deficiencies, if any, during the currency of this Charter Party to be calculated and assessed as binding on both parties by independent weather routing company (or in case of cessation of activities independent weather routing company by similar professional body) and to be paid by Owners accordingly.

### CLAUSE 33 - Crew Assistance

Owners / crew to render customary assistance (See Clause 26) and provided, local port regulations permit, following works:

a) Deleted as vessel is gearless.
b) Opening and closing hatches;
c) Shifting operations and docking;
d) Bunkering
e) Cleaning of holds — intermediate cleaning by Crew;
f) Maintaining power while loading and / or discharging;
g) In case of bulk cargoes: Supervision of loading, stowing, handling and discharging; in case of general of bagged cargoes, supervision of loading, handling and discharging;
h) Clearing and stowage of dunnage. However, all dunnaging / lashing / securing as well as undunnaging / unlashing / unsecuring as well as discharge from vessel of all dunnage / lashing materials to be always arranged and paid by Charterers;
i) Preparing vessel's hatches / holds and cargo gear prior arrival to ports or commencement of operations;

1

TO THE CHARTER PARTY DATED DUBHAI, THE 9TH AUGUST 2006 OF THE

## M/V "CAPE COURAGE"

33. (Cont.)

j) Cargo officers to produce general cargo stowage plan soonest according to cargo description given or if stowage plan is presented form ashore to check and soonest advice omissions / errors etc. making restowing or other measures necessary;

k) Officers and Crew to work day and night, Saturdays, Sundays and holidays included. Above port services to be rendered provided local port regulations permit;

l) It is understood that Owners are not responsible to supply means of shore transport;

m) Lashing and unlashing of logs, erection of stanchions and cargo mark-offs. (providing local regulations permitted and paying Crew's additional bonus of US$ 3.000,00.- [three thousand Dollars]). Bonus to be paid directly to the Crew.

### CLAUSE 34 - Sale Clause

Owners have the option of selling the vessel at any time during the course of this Charter Party and Owners will give Charterers at least 65.- (sixtyfive) days prior to notice of expected time and place which will not interfere with Charterers normal operation of the ship. All time lost and all directly related expenses including additional bunker consumed in related to such sailing to be for Owners' account. Owners to reposition the vessel to a position equidistant from where she went off hire.

The new Owners / flag shall be approved by the Charterers, however such approval not to be unreasonably withheld. Such written approval to be sent in Owners' office latest within 5.- (five) working days after Owners' written request has been presented to Charterers' to do their best for an earlier reply.

The Buyers undertake to perform that balance of this Charter Party at the same terms and conditions which to be stated in the Sale Contract. Owners always to guarantee full performance of new Owners, this to be done in a performance guarantee on Owners' letterhead signed by authorised person, subject to Charterers' approval. During the currency of Charter Party while transferring vessel's ownership or flag, however, any such change only permitted provided Charterers' ability to trade vessel is not adversely affected, the new ownership's P and I Club and insurance covered are under and acknowledged by the International Recognized Association.

The vessel's class should be remained same or equivalent to present vessel's class.

### CLAUSE 35 - Vessel's Gear and Equipment

Deleted as vessel gearless.

### CLAUSE 36 - Cargo Claim Time Bar

Charterers shall be discharged and released from all liability in respect of cargo claims Owners may have under this Charter Party unless a claim has been presented to Charterers in writing with all available supporting documents within 12.- (twelve) months from the date of redelivery.

### CLAUSE 37 - Time Clause

All reference to time are understood to be G.M.T. time.

### CLAUSE 38 - On/Off — Hire Survey

A joint on-hire/off-hire survey for the purpose of determining vessel's condition, quantities of bunkers, fresh water etc., to be held in the port of delivery or at first loading port./ port after delivery or last port of discharge. Charterers to appoint a surveyor acting on their behalf for performing a join on and off hire bunker and condition survey. Joint on hire survey to be in Owners' time and joint off hire survey to be in Charterers' time. Expenses to be shared equally.

2

## M/V "CAPE COURAGE"

### CLAUSE 39 - Stevedoring 'Operation / Damages

a) Deleted as vessel gearless.

b) The Charterers shall hold Owners harmless for all Stevedore damage provided that Owners shall first have used due diligence to secure an admission of liability in respect of such damage from the Party engaged or employed in the stevedoring and that, the Master must hold the Party responsible in writing and report each occurrence to Charterers within 24.- (twenty-four) hours. Charterers shall not be responsible for fair wear and tear commensurate with the nature of the trade.

c) All Stevedore damages to be repaired at a time convenient to Owners and Charterers. Stevedore damage reports shall be issued by the Master prior to sailing and copies of all correspondence exchanged in this connection must be forwarded promptly to Charterers.

The Charterers have the option of redelivery the vessel, even if damage is not repaired, provided same does not affect the seaworthiness of the vessel. The Owners agree that damage not affecting the seaworthiness of the vessel may remain for occasional repair when the ship is docked for Owners' account, so that the Charterers to pay the actual costs of repair of damage. but not the time used.

Stevedore' damage(s) to vessel's hold ladders to be repaired at Charterers' time and expense before sailing from the port of occurrence or at subsequent port of call if required by inspectors, or latest prior redelivery.

### CLAUSE 40 - Grab Discharge

Vessel has clear unobstructed holds fully suitable for grab discharge. Charterers to have the privilege of using bulldozers in the vessel's holds, weight of same subject to Master's prior approval, which not to be unreasonably withheld.

### CLAUSE 41 - Seizure / Detention Due Ownership and / of Flag

Should the vessel be seized or detained or embargoed due to her flag, registry or Ownership during the currency of this Charter Party, the vessel is off-hire immediately from the time of her seizure or detention or embargo (and all cost by this reason shall be for Owners' account) until the time she resumes full service, unless seizure or detention or embargo Is occasioned by any personal act of emission or default of the Charterers or their agents, or by reason of cargo carried. Any expense directly relating to the vessel incurred by and / or during above seizure or detention or embargo is to be for Owners' account, unless such seizure or detention or embargo is occasioned by any personal act or omission or default of the Charterers or their agents or by reason of the cargo carried.

### CLAUSE 42 - Deratization

The Owners are to provide and keep on board a valid Deratization Certificate throughout the Charter period,

Deratization shall always be for Owners'account.

Fumigation of cargo / dunnage, if any, to be always at Charterers'time and expense.

### CLAUSE 43 - Certificates / Origins I Destination Clauses

a) Throughout the Charter period vessel to be in possession of the necessary valid equipment and all certificates, record and documents necessary to comply with safety and health regulations, international regulations and all current requirements at all ports of call, Panama and Suez Canal included. Any delay or expenses by reason of non-compliance with such regulations or lack of proper documentation or equipment to be for Owners' account.

b) Owners warrant that vessel is in all respect eligible for trading to the port, places or countries, canals as allowed under this Charter Party and that at all necessary times the

c)

3


TO THE CHARTER PARTY DATED DUBHAI, THE 9TH AUGUST 2006 ON

## M/V "CAPE COURAGE"

### CLAUSE 39 - Stevedoring 'Operation / Damages

a) Deleted as vessel gearless.

b) The Charterers shall hold Owners harmless for all Stevedore damage provided that Owners shall first have used due diligence to secure an admission of liability in respect of such damage from the Party engaged or employed in the stevedoring and that, the Master must hold the Party responsible in writing and report each occurrence to Charterers within 24.-(twenty-four) hours. Charterers shall not be responsible for fair wear and tear commensurate with the nature of the trade.

c) All Stevedore damages to be repaired at a time convenient to Owners and Charterers. Stevedore damage reports shall be issued by the Master prior to sailing and copies of all correspondence exchanged in this connection must be forwarded promptly to Charterers.

The Charterers have the option of redelivery the vessel, even if damage is not repaired, provided same does not affect the seaworthiness of the vessel. The Owners agree that damage not affecting the seaworthiness of the vessel may remain for occasional repair when the ship is docked for Owners' account, so that the Charterers to pay the actual costs of repair of damage. but not the time used.

Stevedore' damage(s) to vessel's hold ladders to be repaired at Charterers' time and expense before sailing from the port of occurrence or at subsequent port of call if required by inspectors, or latest prior redelivery.

### CLAUSE 40 - Grab Discharge

Vessel has clear unobstructed holds fully suitable for grab discharge. Charterers to have the privilege of using bulldozers in the vessel's holds, weight of same subject to Master's prior approval, which not to be unreasonably withheld.

### CLAUSE 41 - Seizure / Detention Due Ownership and / of Flag

Should the vessel be seized or detained or embargoed due to her flag, registry or Ownership during the currency of this Charter Party, the vessel is off-hire immediately from the time of her seizure or detention or embargo (and all cost by this reason shall be for Owners' account) until the time she resumes full service, unless seizure or detention or embargo Is occasioned by any personal act of emission or default of the Charterers or their agents, or by reason of cargo carried. Any expense directly relating to the vessel incurred by and / or during above seizure or detention or embargo is to be for Owners' account, unless such seizure or detention or embargo is occasioned by any personal act or omission or default of the Charterers or their agents or by reason of the cargo carried.

### CLAUSE 42 - Deratization

The Owners are to provide and keep on board a valid Deratization Certificate throughout the Charter period,

Deratization shall always be for Owners'account.

Fumigation of cargo / dunnage, if any, to be always at Charterers'time and expense.

### CLAUSE 43 - Certificates / Origins I Destination Clauses

a) Throughout the Charter period vessel to be in possession of the necessary valid equipment and all certificates, record and documents necessary to comply with safety and health regulations, international regulations and all current requirements at all ports of call, Panama and Suez Canal included. Any delay or expenses by reason of non-compliance with such regulations or lack of proper documentation or equipment to be for Owners' account.

b) Owners warrant that vessel is in all respect eligible for trading to the port, places or countries, canals as allowed under this Charter Party and that at all necessary times the

c)

3



## M/V "CAPE COURAGE"

43. (Cont.)

    vessel and/or Owners shall have all valid certificates, records or other documents required for such trade.

    d) Owners warrant that vessel will comply with all laws and regulations of all countries not excluded in this Charter Party.

### CLAUSE 44 - Panama Canal

Owners warrant that vessel can pass Panama Canal with maximum tropical fresh water draft provided the canal draft is in normal level, in accordance with Gatun Lake water level and that all necessary documents and application required by Panama Canal authorities have been sent / done in order to permit canal transit without delay.

### CLAUSE 45 - Pollution Clause

Owners guarantee to provide for the vessel and maintain at their expense and carry onboard the vessel a valid U.S. Coast Guard Certificates of Financial Responsibility as required under the U.S. Federal Water Quality Act and amendments thereto. Owners also warrant to have secured correct certificates for other countries where similar guarantees are required. In no case shall the Charterers be liable for any damages as a result of the Owners' failure to obtain the aforementioned certificates or the Owners' non-compliance with present or future water pollution legislation enacted by individual U.S. States or other countries. Time lost by non-compliance to be considered us off-hire and Owners to hold Charterers harmless against any consequential loss, damage or expense.

### CLAUSE 46 - Grain Fittings

Owners warrant that vessel is a single decker allowed to load and safely carry grain without shifting boards or other fittings for grain and has on board an approved trim and stability manual in accordance with the International Grain Code 1991, as Incorporated into Chapter VI, Solas 1974. Furthermore the vessel to have on board an approved table of heeling moments for "filled holds - ends untrimmed" in accordance with Chapter VI, Part (A) Regulations 4, as amended Solas 1978/1981/1983. For the carriage of grain in bulk the vessel to have on board throughout this Charter period valid documents and certificate Issued by any recognized Classification Society and certificates by National Bureau / Ministry of Transport on the basis of the Solas 1974 regulations. Any cost / time used for trimming / strapping of grain cargo caused by vessel's non-compliance with the above will be for Owners' account.

### CLAUSE 47 - U.S.A. Bunkering

Owners warrant that vessel is eligible and equipped to bunker in the United States of America. its territories arid possessions and will comply throughout the Charter period.

### CLAUSE 48 - Cleanliness

On arrival first load port, vessel to be clean and ready in every respect and in all compartments to receive any permissible cargo to local independent surveyors' and/or competent authorities' satisfaction failing which vessel to be off-hire and Owners to take immediate corrective steps to expedite cleaning as fast as possible including the use of shore labour. If vessel fails inspection all bunkers consumed to be for Owners' account until vessel has been passed in compartments, In case holds fall inspections, time from failing till vessel passed hold inspection again to consider off-hire.

### CLAUSE 49 - Trading limits

World wide trading via safe anchorage(s), safe berth(s), safe port(s), always afloat, always within Institute Warranty Limits excluding:

Turkish occupied Cyprus, Albania, Cuba, Israel, Libya, Lebanon, Syria, Cambodia, Malagasy Republic, North Korea, Orinoco River, Somalia, Pacific C.I.S. ports, Yugoslavia and any

4

## M/V "CAPE COURAGE"

**49. (Cont.)**
Republic/State of former Yugoslavia, Zaire River, Baltic Sea between 1st December and 31st March, Countries under U.N. embargo and any areas where actual war or hostilities are in progress.

If any additional war risk premium/Crew war bonus to be for Charterers' account.

Charterers' option to break Institute Warranty Limits against paying extra insurance premium, but it is understood that vessel never to break ice or follow ice breakers.

Owners will permit Charterers to trade to Iran subject to Owners' approval on case by case basis which not to be unreasonably withheld.

Charterers are able to call Iraq provided the sanctions being lifted and/or cargoes being approved by U.N.

Extra insurance, Crew war bonus, blocking and trapping, if any, to be for Charterers' account.
Additional premium/Crew war bonus/blocking and trapping to be reimbursed by the Charterers upon receipt of Owners Underwriters' net invoices and debit notes for hull and machinery insurance. Such additional premium should not exceed the scale from time to time published by the Institute of London Underwriters.

### CLAUSE 50 - War Clause
In the event of outbreak of war between any of the following countries: United States of America, the country of vessel's flag, Commonwealth of Independent States, P.R. China, United Kingdom, Japan, France. Germany, Charterers/Owners have the option of cancelling this Charter Party. It is understood that war means direct war between these nations and does not include local hostilities or civil war where any of the above countries support opposing sides.

### CLAUSE 51 - War Risk Insurance Premium
The Charterers are allowed to trade the vessel to any area which is now or which may be in the future designated by Lloyd's and/or Owners' hull Underwriters as additional premium area. Always excluded war and war like zones unless prior written consent of the Owners have been obtained, which, however, should not be unreasonably withheld, any extra insurance premium to be for Charterers' account. Otherwise as per BIMCO Conwartime 1993 which attached in Charter Party.

Basic War Risk Insurance premium to be for Owners' account but additional premium, if any, for hull and machinery, Officers/Crew and official Crew war bonus due to the vessel's trading to a restricted area, shall be for Charterers' account. The order of Owners' War Risks Underwriters should be followed. Such extra insurance premiums and bonuses for Charterers' account to be paid to Owners after receipt of proper original vouchers from Owners' Underwriters should be followed. Such extra insurance to be net of rebates and not to exceed the amount charged had the vessel been entered with Lloyds of London Underwriters.

### CLAUSE 52 - Return Insurance Premium
Charterers to have the benefit of any return insurance premium receivable by the Owners from their Underwriters (as and when received from Underwriters, but estimated amount deductible on redelivery) by reason of the vessel(s) being in port qualifying for such returns.

5

## M/V "CAPE COURAGE"

### CLAUSE 53 - Crew on Board

At loading and discharging port(s) if any time is lost by the vessel for reason of not all the Crew being on board when the vessel is ready to sail or for Crew's strike, the vessel shall be off-hire during such time and any expenses for keeping waiting or cancelling tugs, pilot or mooring boats to be for Owners' account.

Any delay, expense and / or fines incurred on account of smuggling by Charterers' servants to be for Charterers' account and if caused by Officers and/or Crew and/or Owners' servant to be for Owners' account.

### CLAUSE 54 - Condition of Cargo Holds

Owners to maintain cargo holds in good condition, free of rust scales, suitable for the carriage of all cargoes except excluded cargoes and to keep vessel well painted with all marks readable at all times.

### CLAUSE 55 - Cargo Exclusions

Livestock, logs, steel rolls and coils, injurious, inflammable or dangerous goods as defined by I.M.O., acids and explosives, detonators, bones, bitumen, black powder, blasting caps, loaded bombs, dynamite, T.N.T., ammonia nitrate, calcium carbide, ferro silicon, naphta, tar or any of its products, petroleum or any of its products, petcoke (needle) pitch, quebracho extracts, resins manioc and manioc products, arms, ammunition, asphalt, pitch in bulk, nuclear fuels and materials, turpentine, pig iron, sulphur, sponge iron, radioactive products and waste, hides, creosoted goods, calcium hypochlorite, motor blocks, motor vehicles (with petrol in tanks and batteries connected), turnings, bulk cement and clinker, fish meal, soya meal, Indim coal, D.R.I., hot briquette iron, iron briquettes, cotton, tobacco, prefabricated and mobile buildings, steel pipes, scrap, sulphur, salt, sunflower seed expellers, copra, bones, borax, rock salt, copper concentrates.

All cargoes carried under this Charter Party are to comply with I.M.O. Code of Safe Practices and Bulk Cargoes.

It is understood that maximum 3.- (three) cargoes out of sulphur, cement clinker or salt will be allowed to be carried during the whole period but not as consecutive or last cargo prior redelivery.

Sulphur/Salt protective clause:

- A) Before loading, all holds assigned for cargo to be limewashed by Charterers at their time and expense/risk to the satisfaction of Master and independent Surveyor appointed by Charterers at their time/expenses.
- B) Cargo to be loaded / stowed / trimmed / discharged strictly according to latest I.M.O. and/or any other latest regulations/rules/rules applicable to such cargo.
- C) All fresh water used during loading/discharging to be for Charterers 'account.
- D) After discharge Charterers to supply sufficient fresh water at their expense for washing down of all holds.
- E) Such cargo not to be the last cargo prior redelivery
- F) Charterers are allowed to use ship's Crew to perform lime washing and removal of same against paying US$ 5.000,00.- (five thousand Dollars) besides normal intermediate hold cleaning, but always subject to prior consent of Master/Crew and local regulations permitting, and all time used to be for Charterers' account.
  Owners/Master not to be held responsible for passing hold cleanliness for loading next cargo.

If redelivery after minimum 120.- (one hundred and twenty) days no other dirty cargo.

6

TO THE CHARTER PARTY DATED DUBHAI, THE 9TH AUGUST 2006

## M/V "CAPE COURAGE"

**55. (Cont.)**
If redelivery after about 180.- (one hundred and eighty) days, one additional dirty cargo, understood no consecutive to clinker and not last cargo.

### CLAUSE 56

Owners to allow Charterers to discharge full cargo without presentation of original Bills of Lading by providing Owners with a Letter of Indemnity in accordance with Owners' P. and I. Club form and wording before discharge. Letter of Indemnity to be signed by Charterers only.

Owners to allow Charterers to make a change of destination in the original Bills of Lading by providing Owners with a Letter of Indemnity to be signed by Charterers only.

Original Bills of Lading to be made available to Agents at discharging port as soon as possible. It is understood Messrs. Energy to endeavor to make original Bills of Lading available within 45.- (fortyfive) days after completion of discharge.

### CLAUSE 57 - Dry Docking

Owners to give Charterers 60.- (sixty) days notice for intention of drydocking (except in case of emergency), together with the estimated duration. Payment of hire to be suspended until vessel is again in the same or equivalent position and in a proper state for the service.

### CLAUSE 58 - Eligibility Clause

Owners represent and guarantee that Owners and the vessel are not in any way directly or indirectly owned, controlled by or related to any Cuban, North Korea. Iraqi. Iranian, Libyan or Sudanese interest. Vessel not to have traded Cuba in 2.- (two) years.

Owners also represent and guarantee that vessel has not called at a Cuban port within 180.- (one hundred and eighty) days of the vessel's delivery to Charterers on time Charter under the present Charter Party.

Charterers guarantee that vessel shall not be instructed by them to call at a Cuban port for any reason whatsoever within the last 180.- (one hundred and eighty) days prior redelivery of the vessel to Owners from the present Charter Party.

In the event that country under whose flag the vessel sails becomes subject to economic sanctions which are imposed or supported by the United Nations, the European Union on and / or the United States of America, Charterers shall have the option to cancel this Charter Party without penalty to either party.

### CLAUSE 59 - Bunkers

Bunkers on delivery to be about 500.-/600.- MT I.F.O. 180 CST and about 50.- MT M.G.O.

Bunkers on redelivery to be about same quantities as actually delivered.

Prices at both ends: US$ 350,00.- per MT I.F.O. and US$ 650,00.- per MT M.D.O.

Estimated value of bunkers on delivery to be paid with first charter hire.

Charterers have the option before delivery and Owners before redelivery to take bunkers at their expense provided no interference with vessel and cargo operations.

### CLAUSE 60 - Deductions from Hire

Charterers have the right to withhold them Charter hire during the period of this Charter any mutually agreed off-hire. Charterers have the right to withhold form last sufficient hire payment(s) estimated value of bunkers on board at redelivery, however final accounting to be arranged as promptly as possible. Owners expense incurred by Charterers to be reimbursed by Owners within 10.- (ten) days of receipt of original vouchers.

7



## M/V "CAPE COURAGE"

### CLAUSE 61 - Bills of Lading Clauses
U.S.A. Clause Paramount, Canadian Clause Paramount or General Clause Paramount as applicable, New Jason Clause, New Both-to-Blame Collision Clause, Conwartime 93 (for voyage Charters) to be deemed fully incorporated in this Charter Party and in all Bills of Lading issued under this Charter Party.

### CLAUSE 62 - Pre-loading / Pre-discharge Surveys
Deleted as not applicable.

### CLAUSE 63 - Conduct Captain
The provision of clause No. 9.- does not affect the Charterers' right to advance any claim or require Arbitration under clause No. 17.- of any dispute regarding the conduct of the Master in prosecution of the voyages and in carrying out the orders and directions of the Charterers.

### CLAUSE 64
If vessel is ready to deliver at any time before 24,00 hours local time on the 16th August 2006, Charterers to take delivery upon vessel's readiness. Charter hire to be reduced by 40% (forty percent) from the time of actual delivery until 24,00 hours local time on the 16th August 2006.

### CLAUSE 65 - Double Banking
Charterers have the privilege to double bank the vessel, i.e. may order the vessel alongside another vessel and/or viceversa, provided always afloat considered safe. Necessary fenders to Master's satisfaction to be provided by the Charterers. Any damage sustained by the vessel to be for Charterers' account.

### CLAUSE 66 - Suez / Panama Canal Transit
Charterers' privilege to sail vessel via Suez / Panama. Vessel to provide a valid Suez Canal Tonnage Measurement Certificate. Charterers paying all canal tolls / dues and transit costs.

### CLAUSE 67 - F.I.O Clause
All loading /discharging operations to be free of expense to the Owners.

### CLAUSE 68 - Put Back On Voyage For Owners' Purpose
Should the vessel be put back while on voyage for Owners' purpose, the hire shall be suspended from the time of her putting back until she be again in same position or in any other position not less advantageous to the Charterers.

### CLAUSE 69 - Taxes / Dues
All taxes and / or dues on ship and / or cargo and/ or freight and / or hire earned by Charterers to be for Charterers' account.
Those taxes levied by the country under whose flag the vessel sails to be for Owners' account.

### CLAUSE 70 - Itinerary
Charterers undertake to keep Owners informed during the period of this Charter Party with regard to the itinerary of the vessel and names of their Agents at all ports of call.

### CLAUSE 71 - Charterers' Responsibility towards Agents for Services Rendered
The Charterers shall remain directly responsible towards their Agents, contractor Port Authority, etc., for all goods or services supplied for their account.

8

TO THE CHARTER PARTY DATED DUBHAI, THE 9TH AUGUST 2006

## M/V "CAPE COURAGE"

71. (Cont.)

Furthermore Charterers shall indemnify Owners against all expenses at a result of action taken at any time against the vessel for no payment of goods and services supplied for the account of Charterers or sub-Charterers.

### CLAUSE 72 – Seaworthy Trim Condition

Vessel to be always left in seaworthy trim condition by Charterers to Master's satisfaction.

### CLAUSE 73 – Arbitration Clause and Applicable Law

The constructions, validity and performance of this Charter Party shall be governed by English Law. The High Court in London shall have exclusive jurisdiction over any dispute which may arise out of this Charter Party.

Notwithstanding anything contained herein to the contrary, should the sum claimed by each Party, excluding interest and cost not exceed US$ 75.000,00 - (seventy-five thousand Dollars) the dispute is to be governed by the terms of the Small Claims Procedure of the London Maritime Arbitrators Association current at the time when the Arbitration proceedings are commenced.

### CLAUSE 74 – Vessel's Description

M/V 'CAPE COURAGE'
BULK CARRIER, SINGLE SCREW MOTOR DRIVEN, FLUSH DECKER
Built KODAMATSU, JAPAN – Year 27/05/1982 – Yard KASADO DOCKYARD
Ex name: M/V 'ATENI' - Current name: M/V 'CAPE COURAGE'
Flag: PANAMA - Class: LR+A1 BULK CARRIER - Register number: 31796
International GRT/NRT: 35.063/19.650 - Panama/Suez GRT/NRT:30.325,14/22.999,19
Loa 225,03 - M - Breadth 32.20 - M - Depth moulded 17,80 - M
Main engine type: UBE-MHI8 UEC 60/150H
Summer SW dwt/draft/tpc: 63.770 - MT / 12,620 - M / 64,00 -
Winter SW dwt/draft/tpc: 62.092 - MT / 12,358 - M / 64,00 -
Tropical FW dwt/draft/tpc: 65,453 - MT / 12,882 - M / 65,00 -
Fresh water dwt/draft/tpc: 65.646 - MT / 12,912 - M / 65,00 -
Tanker Capacities: fuel/gas oil mt/cbm: F.O. 2.817,57 - cubic meters/D.O. 230,75 - cubic meters
Freshwater tank capacity: total 458,68 - MT
Ballast water /sewage tank capacity: water ballast tank capacity 21.071,73 - cubic meters / No sewage holding tank – seawage treatment plant fitted.
Constant 330 - MT
Un-pump out ballast (max): 300 - MT – Un-pump out fuel/gas oil (max):150/15 - MT
Distances:
From waterline to highest point (laden): 38,40 - M
From waterline to highest point (ballast): 44,20 - M
From waterline to top of hatchcoaming (laden): 7,10 - M
From waterline to top of hatchcoaming (ballast): 15,70 - M
From tanktop to underside of hatchcover: 17,70 - M
From tanktop to underside of weatherdeck: 15,90 - M
From top of hopper to underside of weatherdeck: 11,90 - M
From top of hopper to bottom of wing tanks: 6,06 - M
Hatch dimensions:
1) 12,00x11,20x1,252 M – 2) to 7) 16,80x12,80x1,288 M
Hatchcovers (including tween) type: SIDE ROLLING/HYDROULIC/CHAIN DRIVEN
Padeyes on deck/hatches: NONE

9

TO THE CHARTER PARTY DATED DUBHAI, THE 9TH AUGUST 2006 CONTINUA

## M/V "CAPE COURAGE"

74. (Cont.)

Deck lashing for lumber: NONE

Vessel fully fitted for carriage of containers including lashing materials: NIL

Container capacity in holds/on deck: NA

Hull & Machinery value & name of Underwriters: NORTH OF ENGLAND

P. & I. Club: NORTH OF ENGLAND

Oil pollution & wreck removal covered or not: YES

Vessel equipped for loading coal as per latest amendments to I.M.O. Code of Safe Practice for Solid Bulk Cargoes (BC Code): YES

I.T.F. OK

History of groundings/accidents under present ownership: NONE

Port state control during last 2.- (two) years (detained or not): YES

Cargo features:

Cubic capacity (GRAIN/BALE) of each hold: 1) 7.872,04/7.677,88 – 2) 10.910,38/10.616,52 – 3) 10.750,03/10.530,80 – 4) 10.806,51/10.589,07 – 5) 10.873,12/10.667,96 – 6) 10.840,66/10.640,27 – 7) 10.347,55/10.161,39

Clear Hold dimensions and free of corrugations and frames (l/b/h of each different compartment): 1) 21,60x32,00x16,50 M – 2) to 7) 24,80x32,20x16,40 M

Clear tanktop dimensions including tween decker: BREADTH FORWARD/BREADTH AFT/ LENGTH - NO 1)11,80/23,00/18,40 - NO 2) 23,60/24,00/21,60 - NO 3) TO 6) 24,00/24,00/21,60 - NO 7) 23,40/14,20/20,80

Grain fitted or not: YES

Suitable for grab discharge or not/suitable for bulldozer discharge or not: YES

Strength of tank top/tween deck/weather deck: TANK TOP - HOLD/STRENGTH MT/M2 1) 24,00 – 2) 13,50 – 3) 24,00 – 4) 17,00 – 5) 24,00 – 6) 13,50 – 7) 24,00

Logs fitted or not: NA – C.O.2 fitted or not: NO - Mechanical ventilation or not: NO - Australia ladders fitted or not: YES - Panama Canal fitted or not: YES - Suez Canal fitted or not: YES - Lakes fitted or not: YES - Deck space/Hold space without obstacles or not: YES - Steel floored tanktops or not: YES - Alternate holds loading: please advise details

STRENGTHEND FOR HEAVY CARGO – Nos.2.-, 4.- AND 6.- HOLDS EMPTY.

Bunker quality: I.F.O. 180 CST / M.D.O. - Lightweight: 10.866.- MT

Call Sign: H 3 C U – Telephone SAT-M: 763960847 / 763960848 - Fax SAT-M: 763960849

Telex SAT-C 1: 435724810 / SAT-C 2: 435724811 – E-mail: capecourage1@in.mail65.com.sg

Speed and consumption:

Ballast: vessel's speed 13 knots - consumption 29 tons F.O. + 2 tons M.D.O. per day.

Loaded: vessel's speed 13 knots - consumption 32 tons F.O. + 2 tons M.D.O. per day.

Port consumption idle about 1.- MT I.F.O. + about 2.- MT M.D.O.

Bunkers: I.F.O. 180CST RME25 - M.D.O. DMA OR DMB

All above speed/bunker consumptions at sea in good weather conditions upto winds of maximum Beaufort force 4.- (four) and/or Douglas sea state 3.- (three) with no adverse currents and no negative influence of swell.

All details ' A B O U T '

## CLAUSE 75 - P. & I. / War Risk Insurance

Vessel has a valid P. and I. Club insurance and valid basic war risk insurance, being a member of the International Group of P. and I. Club, for the currency of this Charter Party. Charterers' option to replace Owners' extra war risk cover including trapping, blocking and loss of hire with Charterers' cover.

10

TO THE CHARTER PARTY DATED DUBHAI, THE 9TH AUGUST 2006

## M/V "CAPE COURAGE"

### CLAUSE 76 – Unclean Redelivery

On redelivery US$ 5.500,00.- (five thousand five hundred Dollars) in lieu of holds cleaning if clinker, US$ 4.000,00.- (four thousand Dollars) if other cargo.

### CLAUSE 77

Charterers have the option to keep the vessel for short period from the time of actual delivery basis minimum 120.- (one hundred and twenty) days and maximum duration about 180.- (one hundred and eighty) days at the hire rate of US$ 20.000,00.- (twenty thousand Dollars) per day or pro-rata including overtime, always afloat, via safe port(s), safe berth(s), safe anchorage(s) within trading limits, provided Charterers can declare such option to Owners within 10.- (ten) days from vessel's actual delivery date at China.

### CLAUSE 78 – Hire Periods / Owners' Bankers

Hire payable every 15.- (fifteen) days in advance. First hire plus bunker on delivery to be paid within 1.- (one) banking day after vessel's delivery. If redelivery will take place within less than 5.- (five) days, hire is payable day by day.

Hire to be paid to a bank account nominated by Owners' bank account, details as below. Charterers will not agree to the assignment of hire, monies due under this Charter Party, or the Charter Party itself in any circumstances whatsoever.

Owners' bank details: pay to the Bank of New York, for the credit of :

Mashreq Bank, head office – Account No. 802 6113912 – Chip UID: 282631

for the account Emirates Trading Agency Llc

USD A/C No. 044 813 2598 with Mashreq Bank,

Hor Al Anz branch – Dubhai, U.A.E.

### CLAUSE 79 – Speed Consumption

Throughout the currency of this Charter Party, Owners guarantee that the vessel shall be capable of maintaining shall maintain on all sea passages from sea buoy to sea buoy a guaranteed average speed as stipulated in clause No. 74.-.

In the event that the vessel, when complying with Charterers' instructions, is laid up at one ore more ports or places in tropical waters for more than 30.- (thirty) days within 90.- (ninety) days period, then the provision of speed/consumption guarantee shall cease to apply until the vessel is bottom cleaned.

### CLAUSE 80 – N.A.A.B.S.A. Clause

At all ports / docks / berths / anchorages in South America only where it is customary for similar size vessels the vessel may life safely aground.

If Charterers are found legally liable, damage to the vessel's bottom to be for Charterers account and to be repaired by Owners according to the recommendations of the Classification Society during next drydock or as otherwise required by the Classification Society.

### CLAUSE 81 – General Average Clause

At such port or place as may be selected by Owners and Charterers by mutual agreement, Owners respecting subcontract stipulated as long as confined to London or New York. Charterers always to endeavour to fix general average adjustment in London but if same impossible and New York agreed then Charterers to inform Owners immediately.

### CLAUSE 82 – Off-Hire Clause

Charterers have the option to add off-hire to the charter period but such option to be declared 30.- (thirty) days prior to the expiration of the charter period.

11

## M/V "CAPE COURAGE"

### CLAUSE 83 – Excess Period Clause

Should the vessel be ordered on a voyage by reason of which the Charter period will be exceeded, the Charterers to have the use of the vessel to enable them to complete such voyage, provided it could be reasonably calculated that the voyage would allow redelivery at about the time fixed for the termination of the Charter.

### CLAUSE 84 – N.Y.P.E. Interclub Agreement

Liability for cargo claims as between Owners and Charterers shall be apportioned as specified in the Inter-Club New York Produce Exchange Agreement 1996 and subsequent amendments if any (the "Inter-Club Agreement"). Nothing in the provision of clauses Nos. 33.- and 39.- shall be deemed to be material amendment of the cargo responsibility clauses in the Charter Party for the purpose of the Inter-Club Agreement.

### CLAUSE 85 – L.M.A.A. Small Claims Procedure Clause

Notwithstanding anything contained in the Arbitration clause No. 73.- to the contrary, should neither the claim not the counterclaim exceed US$ 75,000,00.• (seventy-five thousand Dollars) exclusive of interest on the sum claimed, costs of the arbitration and legal expenses, if nay, it is hereby agreed the dispute is to be governed by the London Maritime Arbitrators Association Small Claims Procedure 1989, or the latest version should there be a revision.

### CLAUSE 86 – Intermediate Holds Cleaning

US$ 500,00.- (five hundred Dollars) per used hold unless otherwise mutually agreed. Crew to use their best endeavour to effect such cleaning provided weather and duration allow same, but without guarantee and responsibility that cargo holds accepted on arrival at loading port and Owners are not responsible for hold readiness at the loading port(s).

### CLAUSE 87 – U.S.G.G. Compliance Clause

Owners warrant that during the term of the Charter the vessel shall be in full compliance with all U.S. Coast Guard pollution and safety regulations as contained in, but not limited to, Titles 33 and 46 of the Code of Federal Regulations, as amended, and all applicable California and other state pollution and safety laws, rules and regulations as may be promulgated. Owners shall indemnify Charterers for any and all loss, expense and / or damage sustained by Charterers resulting from non-compliance with this Clause. During any and all delay of the vessel resulting from such non-compliance the vessel shall be off-hire. Also the Owners recognizes that the flag state of the vessel might be on the U.S.C.G. targeted list of flag states. As the Owners is aware, this means that the vessel will be subject to a strict U.S.C.G. inspection before being allowed to commence cargo operations in the U.S. Any time lost as a result of the inspection or the inspection procedure will be for Owners' account and, if any deficiencies are found and have to be corrected before the commencement of cargo operations, any time lost and any damages, costs and consequences including nut not limited to carrying charges, extension penalties, rail / barge / lorry demurrage and replacement freight will be for Owners' account.

### CLAUSE 88 – Requisition Clause

Should the vessel be requisitioned by any government or governmental authority during the period of this Charter Party, she shall be off-hire during the period of such requisition and any hire or other compensation paid in respect of such requisition shall be for Owners' account. If the vessel is requisitioned for a continuous period exceeding 6.- (six) months then Charterers to have the option of cancelling this Charter Party.

12

## M/V "CAPE COURAGE"

### CLAUSE 89 – Special Conditions

1. Victualling / messages etd: Charterers paying USD $1.250,00.- (one thousand two hundred and fifty Dollars) per month or pro-rata.

2. If vessel's fuel specs unobtainable then Charterers to obtain closest available specifications available (spec I.F.O. 180 CST RMF25 + M.D.O. DMA or DMB)

3. I.T.F.:

   Owners confirm that the Officers and Crew of the vessel are covered for the duration of this Charter Party by an I.T.F. agreement or other Bona Fide Union agreement confirming to I.T.F. standards acceptable worldwide. Loss of time and extra expenses incurred as a result of a non-compliance shall be for Owners' account and maybe deducted from hire.

   The Owners are responsible for any loss of time or delay or restrictions to the full working of the vessel resulting from any action that may be taken against the ship and / or the Owners by third parties for any reason whatsoever. Any time lost as a consequence of any such action by third parties shall be considered as off-hire and shall be deducted from the hire. Any extra expenses resulting directly or indirectly from such action shall be the responsibility of and paid for by the Owners or, in Charterers' option, shall be paid by Charterers and deducted from hire.

   Owners warrant that the vessel is not blacklisted by any country within the trading limits of this Charter Party.

4. Split Bills of Lading clause:+

   Charterers and / or Agents are hereby authorized by Owners / Master to split Bills of Lading and issued ship delivery orders in negotiable and transferable forms against collection to full set of original Bills of Lading. Delivery orders to conform with all terms and conditions and exception of Bills of Lading and shall not prejudice Shipowners' rights.

### CLAUSE 90 - Vessel Screening

(Part 1 – Technical to be fully incorporated in this Charter Party and to form an integral part thereof)

1. P. and I. Club: Owners guarantee that vessel's P. and I. Club is a member of the International Group of P. and I. Clubs and will remain so throughout the duration of this Charter Party:

2. Classification: Owners guarantee that vessel's classification society is a member of the International Association of Classification Societies and will remain so throughout the duration of this Charter Party:

   Upon request Owners to furnish the classification society's written confirmation in this respect, this confirmation in addiction to details all conditions of class affecting vessel.

3. a) Hull and Machinery insured with:
      Insured value:
   b) Collision insurance insured with:
      Value:
      Refer to above 3A.

   Upon request Owners to furnish written confirmation by the Hull and Machinery Underwriters respectively the Collision Insurance Underwriters.

4. Last drydock when and where:

5. Casualty and Pollution history:
   Collisions, groundings, pollutions, (oil/bunker spills and others)
   First, cargo damage etc over last 2 years: NIL

6. I.S.M.
   The Standard I.S.M. clause forms an integral part of the Charter Party.

13

TO THE CHARTER PARTY DATED DUBHAI, THE 9TH AUGUST 2006 OF THE

## M/V "CAPE COURAGE"

90. (Cont.)

Furthermore, Owners to fax copies of Owners and Managers "Document of Compliance" (D.O.C.) and Ship's "Safety Management Certificate" (S.C.M.) to Charterers.

7. Current Ownership:
8. Lay-up:

Has vessel been in lay-up (when / where / period):
9. Warranties:

a) Owners warrant vessel will not to be sold for scrap after this voyage.

b) Owners warrant that Officers and Crew are fluent in English.

## CLAUSE 91 – I.S.M. Clause

From the date of coming into force of the International Safety Management (I.S.M.) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and the company (as defined by the I.S.M. Code) shall comply with the requirements of the I.S.M. Code. Upon request the Owners shall provide a copy of the relevant Documents of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers. Owners shall indemnify Charterers for any loss, expense and / or damage and / or consequences sustained by Charterer resulting from partial or full non-compliance with this clause.

Any and all delays to the vessel resulting from such partial or full non-compliance with this clause shall not count as laytime or, if laytime has expires as time on demurrage respective, as the case may be, as on-hire time.

## CLAUSE 92
Deleted.

## CLAUSE 93
Deleted.

## CLAUSE 94 - Australia Port Call Clause

If the vessel proceeds to Australian ports, Owners guarantee that the vessel and her equipment comply with current Australian Navigation Regulations and without prejudice to Charterers other rights Owner to indemnify Charterers for any consequences arising from partial of full non-compliance with this stipulation.

Owners guarantee that the vessel is fitted with valid Australian hold and pilot ladders in accordance with W.W.F. requirements or any amendments thereto, and will remain so throughout the currency of this Charter.

The Owners hereby confirm that the Owners duly acknowledge the voluntary guidelines for controls of the discharging of ballast water and sediments for entering Australia from overseas stipulated by Australia quarantine and inspection service.

## CLAUSE 95 – Asian Gypsy Moth Clause (Lymantra Dispar and Lymantra Monacha)

Owners warrant vessel meets all agriculture Canada Plant Protection Division and U.S.D.A. Plant Protection and quarantine office regulations. Furthermore, Owners guarantee that vessel is free of any Asian Gypsy Moth eggs or larvae or any form of Asian Gypsy Moth life. Should the vessel be found to have same after tendering notice of readiness the notice of readiness to be considered invalid. Notice of readiness to be re-tendered the notice of readiness to be considered invalid. Notice of readiness to be re-tendered after vessel is cleared by Canadian / U.S. Authorities, Australia / New Zealand or any other relevant authority. If the vessel is not cleared and not allowed to tender the port and has not presented a valid notice of readiness within the agreed cancelling all

14

## M/V "CAPE COURAGE"

**95. (Cont.)**

costs / consequence / losses / damages / fines whatsoever including loss of sale / purchase to be for Owners' account. Vessel not to have traded to C.I.S. pacific for 2.- (two) years.

Any and all delays to the vessel resulting from such partial or full non-compliance with this clause shall not count as on-hire time.

**CLAUSE 96**
Deleted.

**CLAUSE 97 – Freshwater**

Freshwater consumed under this Charter for domestic purposes to be for Owners' account and freshwater consumed by Stevedores and/or for the purpose of hold cleaning to be for Charterers' account unless provided on board.

**CLAUSE 98 – Manoeuvring**

Vessel uses diesel oil in main engine and generators when entering / leaving port and when manoeuvring in narrow / shallow / restricted waters.

**CLAUSE 99 – Secrecy**

All details of the negotiations and of the actual fixture to be kept strictly private and confidential.

**CLAUSE 100 - Supercargoes / Port Captains.**

The Charterers or their supercargo(es) shall have free and unlimited access to the whole vessel, including bridge, holds and engine room and also to all vessel's tanks including but not limited to bunker, lubricating oil, sludge, ballast and freshwater tanks. Whenever required, the Master must bring the vessel into even trim to ensure correct bunker soundings. The Charterers and/or their supercargo(es) and/or Surveyors to have free and unlimited access to the vessel's deck and engine log books, tank plans, calibration scales and / or other plans as requested and are allowed to make copies of the original log books on board or ashore.

Any cost / time loss to be for Charterers' account due to such assess as per Charterers' request.

**CLAUSE 101 – Off-Hire**

After suspension of hire, from any cause, the vessel shall be placed at Charterers' disposal at the same port or place where hire was suspended, within ordinary office hours, except at sea. Charterers may, however, in their option accept the vessel on hire again in such position and at such time as the vessel may again in all respects be ready to comply with the orders and directions of the Charterers.

The Charterers may in their option, at any time, add to the Time Charter period partly or wholly, any off-hire period(s) exceeding 5 days. The rate of hire for any such added period(s) shall be paid at the same rate as that applicable during the off-hire period(s).

During any off-hire period estimated to exceed eight (8) days, the Owners to give the Charterers not less than five (5) days definite notice or resumption of the service.

If the vessel has been off-hire for a total period of 30 (thirty) consecutive days during this Charter Party, the Charterers are at liberty to cancel the balance of period of this Charter Party and redelivery shall take place provided vessel being free of cargo.

**CLAUSE 102 - Fittings**
Deleted.

15

TO THE CHARTER PARTY DATED DUBHAI, THE 9TH AUGUST 2006

## M/V "CAPE COURAGE"

**CLAUSE 103 – Arrest**
Should the vessel be arrested during the currency of this Charter Party at the suit of any Party having, or purporting to have a claim against any interest in the vessel, the vessel to be considered as off-hire as per Clause 15 except which caused by Charterers and / or Charterers' agents. Any direct expenses resulting from such arrest which the Charterers may incur, to be for Owners' account except which caused by Charterers and / or Charterers agents.

**CLAUSE 104 – Delivery / Redelivery Time.**
Actual time on hire to be calculated basis Greenwich Mean Time but laycan to be basis local time.

**CLAUSE 105 – Cancellation Clause**
Deleted.

**CLAUSE 106**
BIMCO I.S.P.S. Clause of Time Charter to be applied.
BIMCO Fuel Sulphur Content Clause for Time Charter Parties to be applied.
BIMCO A.M.S. Clause of Time Charter to be applied.

**CLAUSE 107**
Deleted.

**CLAUSE 108**
Vessel will comply with all voluntary ballast water exchange programs and complies with all relevant regulations.

**CLAUSE 109**
Vessel has all latest required, valid and up to date certificates on board valid throughout this charter.

**CLAUSE 110**
Vessel not to be cargo batten fitted and no horizontal corrugations and vessel has no center beams in hatches.

**CLAUSE 111**
During the currency of this charter Owners are to allow Charterers to arrange for the fumigation of cargo after completion of loading at their time and expense.

**CLAUSE 112**
Deleted.

THE OWNERS:                                                      THE CHARTERERS:





## ADDENDUM NO. 1

### TO THE CHARTER PARTY M/V "CAPE COURAGE"
### DATED DUBHAI, AUGUST 9TH, 2006

#### BETWEEN

#### MESSRS. QANNAS SHIPPING COMPANY
#### NICOSIA, CYPRUS
#### AS OWNERS

#### AND

#### MESSRS. ENERGY SHIPPING S.P.A.
#### GENOVA, ITALY
#### AS CHARTERERS

IT HAS BEEN TODAY MUTUALLY AGREED THAT:

WITH REFERENCE TO CLAUSE 77:

CHARTERERS EXECISE THEIR OPTION TO INCREASE THE PRESENT TIMECHARTER PERIOD OF MINIMUM 120 DAYS AND MAXIMUM ABOUT 180 DAYS AT THE HIRE OF USD 20,000.00 (TWENTY THOUSAND DOLLARS) PER DAY OR PRO-RATA INCLUDING OVERTIME, ALWAYS AFLOAT VIA SAFE PORT(S), SAFE BERTH(S), SAFE ANCHORAGE(S) WITHIN TRADING LIMITS.

FURTHERMORE CHARTERERS HAVE THE OPTION TO LOAD 1 (ONE) PIG IRON CARGO WITH THE FOLLOWING PROPECTIVE CLAUSE:

#### PIG IRON PROTECTIVE CLAUSE
CHARTERERS TO ENDEAVOUR TO MINIMIZE THE IMPACT OF PIG IRON ON TO THE TANK TOPS BY FURNISHING, AS PER CUSTOM OF THE PORT, WOODEN PALLETS TO RECEIVE THE INITIAL FIRST LOAD OF CARGO.
CHARTERS WILL SUPPLY FOR THEIR OWN ACCOUNT OF WOODEN PALLETS EACH 2 M. X 2 M. AND PLACE THESE ON THE CENTRE OF THE HOLDS AND ADDITIONALLY PLACE A FIFTH PALLET ON TOP OF THE SOFTEN THE IMPACT OF THE FIRST LOAD OF THE CARGO.
THE FIRST LOADS OF PIG IRON IN EACH HOLD TO BE LOWERED AS CLOSE AS POSSIBLE TO TANK TOP AND TO A HEIGHT SO AS TO PROVIDE A PROPER FLOORING AND CUSHION TO MASTER SATISFACTION . CHARTERS TO REMOVE THE PALLETS FROM VESSELS HOLDS AFTER DISCHARGE.
CHARTERERS /STEVEDORES TO DO UTMOST TO ENSURE THAT THE FIRST METER OF CARGO IS LOADED AS GENTLY AND FEASIBLY POSSIBLE.

  

ALL OTHER TERMS, CONDITIONS, EXCEPTIONS OF CHARTER PARTY DATED
DUBHAI, AUGUST 9TH , 2006 TO REMAIN UNALTERED AND TO APPLY

DUBHAI, AUGUST 26TH, 2006

THE OWNERS:                                    THE CHARTERERS:

  

### ADDENDUM NO. 2

TO THE CHARTER PARTY M/V "CAPE COURAGE"
DATED DUBHAI, AUGUST 9TH, 2006

#### BETWEEN

MESSRS. QANNAS SHIPPING COMPANY
NICOSIA, CYPRUS
AS OWNERS

AND

MESSRS. ENERGY SHIPPING S.P.A.
GENOVA, ITALY
AS CHARTERERS

IT HAS BEEN TODAY MUTUALLY AGREED THAT:

WITH REFERENCE TO CLAUSE 81:
GENERAL AVERAGE IN LONDON.

WITH REFERENCE TO CLAUSE 89:
SOUTH AFRICAN BUNKER RMF 25 (180CST) GRADE AND BRAZIL PETROBRAS
BUNKER SPECS (180CST) ARE ALLOWED ON THE BASIS THAT CARBON
CONTENTS ARE WITH IN THE MASTER'S ACCEPTABLE LIMITS WHICH NOT BE
UNREASONABLY WITHHELD BY OWNERS/MASTER.

WITH REFERENCE TO CLAUSE 55:
CARGO EXCLUSIONS:
SOYA BEAN MEAL AND SOYAB BEAN MEAL PELLETS ALLOWED PROVIDED
THEY ARE HARMLESS / NON DANGEROUS/ NON-IMO RESTRICTED GRADES
AND PROVIDED ALL NECESSARY APPROVALS/CERTIFICATES FROM
SURVERYORS AND SHIPPERS ARE OBTAINED AT THE TIME OF LOADING. ANY
DELAYS OR DETENTIONS AT ALL PORTS INCLUDING THE DISCHARGE PORT(S)
TO BE FOR CHARTERERS' ACCOUNT AND TIME.

VESSEL DO NOT HAVE ANY $CO_2$ FITTINGS NOR ANY MECHANICAL
VENTILATION SYSTEM.

WITH REFERENCE TO CLAUSE 49:
TRADING EXCLUSIONS:
KOPER AND BAKAR TO BE ALLOWED.

1

COPY



ALL OTHER TERMS, CONDITIONS, EXCEPTIONS OF CHARTER PARTY DATED
DUBHAI, AUGUST 9TH , 2006 AND ADDENDUN NO. 1 DATED DUBHAI, AUGUST
26TH, 2006 TO REMAIN UNALTERED AND TO APPLY.

DUBHAI, AUGUST 29TH, 2006

THE OWNERS:                                                 THE CHARTERERS:

2